**Lou L. HANKS et al., Plaintiffs,**

**v.**

**Douglas M. COSTLE, Administrator et al., Defendants.**

**Civ. A. No. 79–0412–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 31, 1980.

Patrick M. McSweeney, James F. Stutts, Richmond, Va., for plaintiffs.

Gerald L. Baliles and John A. Gibney, Jr., Bell, Ellyson, Lacy & Baliles, James L. Sanderlin, Wellford L. Sanders, Jr., and Jack M. Ross, Jr., McGuire, Woods & Battle, John W. Burke, III, Richmond, Va., for intervening defendant.

Frederick S. Fisher, Asst. Atty. Gen., Richmond, Va., Peter L. Tribe, County Atty., County of Hanover, James T. Moore, III, Asst. County Atty., County of Hanover, Hanover Va., Robert W. Jaspen, Raymond A. Carpenter, Asst. U. S. Attys., Richmond, Va., Elizabeth Stein, Dept. of Justice, Washington, D. C., Michael Murchison, Environmental Protection Agency, Washington, D. C., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, a group of environmentally-concerned citizens, seek declaratory and injunctive relief against the Administrator of the United States Environmental Protection Agency (EPA), the Virginia State Water Control Board (State Board), and the County of Hanover, Virginia to prevent planned discharges of pollutants by the Bear Island Paper Company from a mill the company is constructing in Hanover County. In 1977, Bear Island announced its plans to construct the mill in Hanover County, and it appears uncontested that county officials have expended considerable effort to facilitate the opening of a new industrial facility in the county. In part as a result of these efforts, the new Bear Island mill is not scheduled to discharge pollutants directly into the North Anna River, on which it is located. Instead, the Bear Island discharge will be piped to Hanover County's Doswell treatment plant, from whence it will be discharged into the river.[1] In order to accommodate the Bear

---

1. The Bear Island discharge will not receive further treatment at Doswell, but, purportedly due to its relative cleanliness, will go directly into the Doswell plant's outfall, and thence directly into the river.

Island discharge, Hanover County applied for a revision to its Doswell plant's National Pollutant Discharge Elimination System (NPDES) permit. The county's application for a new permit in turn made necessary consideration of a revision in the discharges allowed by Virginia's York River Basin Water Quality Management Plan, adopted in accordance with § 208 and § 303 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1288, 1313. In mid–1978, following a public hearing, the State Board revised the Doswell permit, and simultaneously made revisions in the water quality plan.[2]

For reasons hereinafter referred to, plaintiffs object both to the substance of the revised permit and plan, and the procedures employed by the State Board and EPA in making the revisions. Plaintiffs' complaint originally contained ten separate claims, but plaintiffs have not contested defendants' motions for summary judgment on five of those claims. Plaintiffs' remaining claims (Claims I, V, VI, VII, and VIII) are now before the Court on motions of the respective parties for summary judgment. Both sides have fully briefed the issues raised by the motions, and the matter is ripe for disposition.

**A.** *Public Participation*

In Claim I, plaintiffs maintain that the permitting procedure followed by the State Board and EPA violated the public's right to participate in implementation of the FWPCA under 33 U.S.C. § 1251(e).[3] Plaintiffs object both to the manner in which the new Bear Island permit was issued, and the manner in which the state water quality plan was revised. Jurisdiction for Claim I is based on 33 U.S.C. § 1365(a)(2), which

provides a cause of action to any citizen who alleges a failure of the Administrator of EPA to perform a duty that is nondiscretionary under the FWPCA. It is apparent, however, that plaintiffs here complain not only of duties that the Administrator allegedly failed to perform, but also of alleged failures of State Board members to comply with the Act. It is apparently plaintiffs' theory, both as to the permit and the plan, that 33 U.S.C. § 1251(e) not only requires that EPA provide for public participation in accordance with the statute in its own decision–making processes, but also mandates that EPA reject any permit or plan issued by a state that does not adequately provide for public participation. Finally, plaintiffs maintain that the issuance of the permit here amounted to the establishment of a new source performance standard (NSPS) by the State Board. Relying on this characterization of the Board's action, plaintiffs allege a violation of the notice and comment requirements of 33 U.S.C. § 1316(b)(1)(B), on the ground that neither the Board nor EPA solicited public comment on the new "NSPS".

▬ 1. *Promulgation of New Source Performance Standards.* Plaintiffs' argument that the State Board, on June 19, 1978, submitted its "proposed NSPS" for pulp and paper mills to EPA and thereby violated the provisions of 33 U.S.C. § 1316 borders on the frivolous. A state has no authority to promulgate a NSPS under 33 U.S.C. § 1316, as is plain from even a cursory reading of the statute. Plaintiffs cannot seriously hope to characterize the submission of an NPDES permit to EPA, and EPA's subsequent decision not to object to that permit as the promulgation of an NSPS. Plaintiffs are demonstrably aware

---

**2.** The plan revisions did not technically become effective until their approval by EPA. For reasons apparently unrelated to this action, EPA did not formally approve the revision until December of 1979.

**3.** Title 33, § 1251(e) states:
 Public participation in the development, revision, and enforcement of any regulation,

standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

of the provisions of 33 U.S.C. § 1316. Their Claim IX, which they chose to abandon, complained that EPA had failed in *its* statutory duty to promulgate needed NSPSs. Regardless of the reasons for that choice, it is clear that plaintiffs' instant allegation that the State Board or EPA had violated any part of 33 U.S.C. § 1316 cannot be sustained, and that summary judgment is warranted. If plaintiffs wish to complain about EPA's failure to promulgate an NSPS for pulp and paper mills, they need only make, and pursue, the proper allegations; they need not come before the Court relying upon, as the record reflects, an obvious mischaracterization of the facts.

2. *NPDES Permit.* EPA regulations require that a state permitting program provide the general public with notice of, and an opportunity for a hearing dedicated to discussion of any application for an NPDES permit. *See* 40 C.F.R. § 124.31–37 (1978).[4] EPA maintains that these regulations provide for adequate public participation in the issuance of permits, and clearly fulfill the requirements of 33 U.S.C. § 1251(e). Plaintiffs in response claim that meaningful public participation cannot be provided for solely by blanket regulations, and that the statute requires a sensitive, ad hoc treatment of individual permit decisions in order to truly "provid[e] for, encourag[e], and assist" the public. Necessarily, plaintiffs contend that such treatment was absent here. In particular, plaintiffs claim that EPA should have responded more promptly and fully to a letter it received from an interested citizen,[5] and should have provided citizens with

an explanation of the technical issues that arose during its review of the Bear Island permit.[6] As support for their claims against EPA, plaintiffs point to regulations and sections of the FWPCA which appear to apply in similar or analogous situations,[7] and to related background documents published by the Agency.[8] Additionally, plaintiffs complain that EPA's alleged effort to cooperate with Hanover County in expediting issuance of the Bear Island permit and the subsequent state plan revision further disadvantaged participation by the average citizen vis–a–vis Bear Island and the county, due to the latter parties' greater technical resources.

■■■ Whatever force plaintiffs' argument originally had, its strength has clearly been attenuated by the Supreme Court's recent ruling in *Costle v. Pacific Legal Foundation*, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980). In that case the Supreme Court held that EPA's promulgated regulations for public participation in the issuance of permits by EPA were "fully consistent" with 33 U.S.C. § 1251(e) and other sections of the Act. 48 U.S.L.W. at 4248. The regulations considered by the Supreme Court in *Pacific Legal Foundation*, are in substance virtually identical to the regulations in question in the instant case. *Compare* 40 C.F.R. § 124.31–37 (1978) (EPA requirements for public participation in issuance of NPDES permits by states) *with* 40 C.F.R. § 125.31–37 (1978) (requirements for public participation in issuance of NPDES permits by EPA.)[9] In light of the

---

4. All citations in this opinion refer to the regulations in force at the time of the issuance of the Bear Island permit. Many of those regulations have since been revised or recodified.

5. Letter from Margaret R. Miller (Citizens for Sensible Growth) to Jack Schramm (EPA, Region III) of May 4, 1978. Ms. Miller is not a plaintiff in the instant case.

6. The Bear Island permit was issued by the State of Virginia, to which the above–cited regulations regarding public comment apply. Under 33 U.S.C. § 1342, EPA has the authority to review a permit if it chooses to do so (as it did here), and may veto a permit that fails to comply with certain statutory provisions.

7. *E. g.*, 33 U.S.C. § 1342(d)(4) (requirement that Administrator hold public hearing where EPA objects to issuance of state permit); and 40 C.F.R. § 124.32, 33, 37 (1978) (requirements that permit program provide "at least" certain specified items) (which plaintiffs argue can be interpreted to imply the existence of unspecified, ad hoc requirements).

8. Plaintiffs give special attention to the contents of an EPA newsletter, *EPA Alert* (April 1979) (special ed. on Public Participation).

9. To the extent that plaintiffs rely on 40 C.F.R. § 105 (1978), the regulations cited by plaintiffs are actually the same regulations upheld by the Supreme Court in *Pacific Legal Foundation.*

Supreme Court's pronouncements in that case, and of the regulations' apparent reasonableness here, the Court holds, without further unnecessary and burdensome discussion, that the regulations promulgated by the EPA in 40 C.F.R. § 124 (1978) on their face satisfy the Agency's obligation under § 1251(e) to assist the public and provide for public participation in pollution control.[10]

■ Even granting the facial validity of EPA's regulations,[11] however, it remains open to question whether the State Board has properly followed those regulations. Plaintiffs have alleged facts which if true would raise questions as to whether the State Board is complying with the public participation requirements of the Act. In particular, plaintiffs allege that Bear Island's ex parte contacts with the State Board were so extensive that they rendered the traditional notice and comment provisions of the regulations meaningless. Nevertheless, in the instant case it is unlikely that plaintiffs could establish a direct cause of action against the state's issuance of the Bear Island permit. *See Chesapeake Bay Foundation, Inc. v. Virginia State Water Pollution Control Board*, 501 F.Supp. 821 (E.D.Va.1980) (no cause of action against state officials exists under 42 U.S.C. § 1983); *Chesapeake Bay Foundation, Inc. v. Virginia State Water Pollution Control Board*, 495

F.Supp. 1229 (E.D.Va.1980) (no implicit cause of action created by the FWPCA against state officials); *Chesapeake Bay Foundation, Inc. v. United States*, 445 F.Supp. 1349, 1353–54 (E.D.Va.1978) *and cases cited therein* (with narrow exceptions, EPA decision not to object to individual permit unreviewable in federal district court). Should plaintiffs seek to obtain review of the entire Virginia NPDES program, however, courts have suggested procedures which may ultimately lead to judicial review of the program's procedures. *Save the Bay Foundation, Inc.*, 556 F.2d 1282, 1290–92 (5th Cir.), *reh. denied*, 560 F.2d 1023 (1977); *Chesapeake Bay Foundation, Inc.*, 501 F.Supp. 821 (E.D.Va.1980). If the true thrust of plaintiffs' complaint here is, as it seems to be, that "Virginia regulatory agencies continue to operate in such close cooperation with the business to be regulated ... [that] there is no way citizens can be effective"[12] in influencing regulatory decisions, then plaintiffs have chosen, in the Court's view, the wrong vehicle and would be well–advised to seek relief according to the procedures laid out in those cases.

■ 3. *Plan Revision.* Plaintiffs contend that EPA should not have approved the revision in the state water quality plan for, in the most part, the same reasons discussed *supra* regarding public participation in issuance of the permit. The Court

To the extent that plaintiffs rely on the narrow, literal minded argument that EPA's purported "approval" of (rather than, under 33 U.S.C. § 1342(d), a mere refusal to object to) the Bear Island permit has some legal significance under Claim I, the Court holds that *Costle v. Pacific Legal Foundation* dispositively vindicates the EPA regulations in question. *See* n.14 *infra.*

**10.** Plaintiffs also argue that EPA failed to satisfy 33 U.S.C. § 1251(e) by not providing notice of and a hearing on its own review of the Virginia permit, and for failing to offer to educate citizens interested in the technical complexities that underlay the issuance of the Bear Island permit. EPA in response, and in the Court's view appropriately, contends that it lacks the resources to act as an "environmental legal aid society," and can best protect the environment and the public interest by following its current practices. *See Costle v. Pacific*

*Legal Foundation*, 445 U.S. at 213, 100 S.Ct. at 1104 (recognition of relevance of effects of decision that would endanger EPA's ability to administer the Act due to drain on Agency's financial resources.) The Court is satisfied that so long as the interested public has an opportunity to express its views at a public hearing prior to a final decision to issue a permit, EPA's obligation to issue regulations under 33 U.S.C. § 1251(e) is satisfied. Not only did the instant plaintiffs have a mere *opportunity* for a hearing as in *Pacific Legal Foundation*, but an actual hearing was held and attended by certain plaintiffs.

**11.** 40 C.F.R. § 124.31 ·37 (1978).

**12.** Letter from Margaret R. Miller (Citizens for Sensible Growth) to Jack Schramm (EPA, Region III) of May 4, 1978.

notes that, as in the case of the Bear Island permit, the State Board held a hearing (which some, but not all, of the plaintiffs attended). The Court holds, on the same grounds as discussed in notes 9–10 *supra*, that EPA's regulations for public participation in review of state water quality plans on their face satisfy the requirements of 33 U.S.C. § 1251(e). As heretofore discussed, to the extent that plaintiffs complain that the State Board failed to abide by those regulations, they should first seek review by EPA of Virginia's continuous planning process. *See* 33 U.S.C. § 1313(e).

## A. *Claim VI–EPA Review of the State Permit*

Plaintiffs' allegations under Claim VI apply only to EPA. Plaintiffs originally relied only on Fifth and Fourteenth Amendment guarantees of due process for jurisdiction, but now argue that the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, also provides the Court with jurisdiction and an appropriate standard of review. Because plaintiffs limit their Constitutional claims to allegations that EPA acted in an "arbitrary, capricious, and unreasonable" manner,[13] their proffered jurisdictional bases provide, for present purposes, identical standards of review, and the Court need not

decide whether to restrict itself to any particular jurisdictional base.[14]

This and other courts have discussed the circumstances under which EPA's review of a state permit is reviewable by the federal courts. *See District of Columbia v. Schramm*, No. 78–2209, 631 F.2d 854 (D.C.Cir. June 18, 1980); *Save the Bay, Inc.*, 556 F.2d at 1292–96; *Mianus River Preservation Committee v. Administrator, EPA*, 541 F.2d 899, 907 (2d Cir. 1976); *Chesapeake Bay Foundation, Inc.*, 445 F.Supp. at 1353. Although this Court need not decide precisely what standard of review must apply in all situations, it is evident that all the standards applied presume the validity of agency action, and do not provide for consideration of the agency decision de novo. Indeed, it appears that to prevail, plaintiffs must show at the least, as they have not, that EPA has arbitrarily failed to consider some material fact presented to it.[15] An examination of the affidavits and supporting materials submitted by the parties leads the Court to conclude that no genuine issue of fact as would support a finding of arbitrary action by EPA remains here.

Plaintiffs, in addition, contend that EPA, in violation of its usual practices, did not require verification and calibration of

13. Complaint, paragraph 55.

14. Plaintiffs also claim that the Agency acted in excess of its statutory authority. This claim arises from a written statement made by a representative of EPA's Region III office that the Agency had "approved" the Bear Island permit. *See* Letter from Jed Z. Callen (EPA) to R. V. Davis (State Board) of July 7, 1978. Plaintiffs contend that under 33 U.S.C. § 1342(d) EPA has authority only to choose not to object to a permit, and that the use of the word "approved" in the Agency's correspondence constituted an illegal abuse of discretion. In addition, plaintiffs argue that EPA "approval" here produced the impression that EPA actively championed the issuance of the Bear Island permit, and thus affected the political balance of forces confronting the Virginia State Board. The Court considers plaintiffs arguments to be, to say the least, unconvincing.

15. This Court, as have the majority of the Courts of Appeals, has gone so far as to suggest that EPA's failure to object to an NPDES permit is entirely unreviewable in the federal

courts, even where a permit clearly violates the FWPCA. *Chesapeake Bay Foundation, Inc.*, 445 F.Supp. at 1353 n.6. *See District of Columbia v. Schramm*, 631 F.2d at 861; *Mianus River Preservation Committee v. Administrator, Environmental Protection Agency*, 541 F.2d 899, 909 n.24. The United States Court of Appeals for the Fifth Circuit, in *Save the Bay, Inc.*, declared that an EPA decision not to object to a permit may be reviewed under the APA, but only to determine whether EPA has considered, in a non-arbitrary manner, all alleged violations of federal standards, or to determine whether the Agency has based its decision on statutorily irrelevant considerations. 556 F.2d at 1296. This Court, in *Chesapeake Bay Foundation, Inc.*, found it unnecessary to specify whether it accepted the Fifth Circuit's more liberal standard of review. *See* 445 F.Supp. at 1353 n.7. Because the facts in the instant case fail to establish a material issue of fact under either standard, it is similarly unnecessary to reach that issue here.

the model used to predict the water quality impact of the new Bear Island plant.[16] EPA has produced affidavits that state that although calibration and verification of a model are always desirable, they are not always practical, and are not required as a precondition for approval of all water quality plans for all stream segments.[17] Plaintiffs argue both that the sworn statements by EPA officials contradict each other, and that EPA has failed to consider several technical points raised by plaintiffs' own expert witness.[18] The Court finds no material contradiction among the statements made by EPA.[19] Plaintiffs' latter contention—that the data available are insufficient for verification of the model used by the State Board—is logically more relevant, but ultimately unavailing. EPA officials freely admit that the model used by the state might be improved by further verification. *See* Deposition of Charles William App 73 (Dec. 18, 1979). Indeed, plaintiffs' expert admits that *no* model can be properly calibrated until actual discharges begin. *See* Deposition of George M. Hornberger 61 (Feb. 12, 1980). Here, following what appears to have been an initial review of the permit, EPA has chosen to allow Virginia to rely on monitoring of the actual water quality of the North Anna River. The court holds that EPA has not acted arbitrarily by allowing a state to adopt such a practical approach to enforce its own water quality standards.[20] Although Virginia's approach poses some risk for Bear Island should the impact of its plant be greater than anticipated, the risk results more from the underlying scientific uncertainty associated with water quality modeling than the form of the state NPDES permit.

## C. *Remaining Claims*

Plaintiffs' Claims V, VII and VIII directly attack the substance of the permit issued by the State Board. Plaintiffs maintain that the FWPCA, and in particular 33 U.S.C. § 1365(e),[21] establishes a cause of action against the State Board.

■ This Court has already given lengthy consideration to the question of whether the FWPCA, or 33 U.S.C. § 1365(e), provides a party with an implicit cause of action. The Court conclusively responded to that issue in a manner contrary to plaintiffs' position in *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board,* 495 F.Supp. 1229 (D.C.1980), a case decided subsequent to the filing of the instant one. In *Chesapeake Bay Foundation,* the Court applied the analysis suggested by the Supreme Court in

---

**16.** The Court restricts itself here to consideration of the issues raised in paragraphs 53–55 of the complaint, and not the additional issues argued by counsel under Claim VI in subsequent pleadings.

**17.** Affidavit of Charles W. App (Defendants' Joint Appendix II, Exhibit 8); Affidavit of Charles W. App (April 21, 1980).

**18.** *See* Reply Memorandum in Support of Plaintiffs' Cross–Motion for Summary Judgment 4·7.

**19.** EPA experts admitted that verification and calibration were required for the modelling of some stream segments; they did not state, as plaintiffs necessarily contend, that EPA routinely requires verification for all stream segments.

**20.** It is apparently undisputed that the Bear Island permit requires compliance with applicable federal, technology–based standards. The Act, though, incorporates by reference, more stringent, state water quality–based standards,

*see* 33 U.S.C. § 1311(b)(1)(C), and some debate exists whether the permit will guarantee compliance with Virginia's more stringent standards. The fact that no standard based directly on federal law is even alleged to have been violated here raises serious questions of why this Court should consider the instant claims, even if it were undisputed that the state permit allowed violation of state law. In any event, under the Bear Island permit, Virginia retains the authority to require compliance with these state standards. Va. NPDES Permit No. 002951, Pt.II at 3, paragraph 6 (as amended and reissued Sept. 1, 1978).

**21.** Section 1365(e) states:

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

*Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and concluded that neither 33 U.S.C. § 1365(e) nor the remaining sections of the FWPCA create a federal cause of action. *Accord, District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir. 1980). No persuasive argument is made here which warrants a departure from the Court's view as expressed in *Chesapeake Bay Foundation*, in reference to this issue.

Because no material fact remains in dispute, and because none of plaintiffs' claims can be sustained, summary judgment for the defendant on all remaining counts is warranted.